## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

KEISHA J.,[1]

       Plaintiff,

                        **Case No. 3:22-cv-6438**

   v.                      **Magistrate Judge Norah McCann King**

MARTIN O'MALLEY,
Commissioner of Social Security,

       Defendant.

### OPINION AND ORDER

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Keisha J. for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* Plaintiff appeals from the final decision of the Commissioner of Social Security denying that application.[2] After careful consideration of the entire record, including the entire administrative record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court affirms the Commissioner's decision.

## I.    PROCEDURAL HISTORY

On July 31, 2015, Plaintiff filed her application for benefits, alleging that she has been disabled since July 14, 2015. R. 159, 172, 453–66. The application was denied initially and upon reconsideration. R. 230–34, 236–38. Plaintiff sought a *de novo* hearing before an administrative

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to plaintiffs in such cases by only their first names and last initials. *See also* D.N.J. Standing Order 2021-10.

[2] Martin O'Malley, the current Commissioner of Social Security, is substituted as Defendant in his official capacity. *See* Fed. R. Civ. Pl 25(d).

1

law judge ("ALJ"). R. 239–40. An ALJ held a hearing on March 12, 2018, at which Plaintiff,

who was represented by counsel, appeared and testified, as did a vocational expert. R. 41–72. In

a decision dated May 9, 2018, the ALJ concluded that Plaintiff was not disabled within the

meaning of the Social Security Act from July 14, 2015, Plaintiff's alleged disability onset date,

through December 31, 2017, the date on which Plaintiff was last insured. R. 176–85. The

Appeals Council vacated that 2018 decision and remanded the case for renewed consideration of

Plaintiff's residual functional capacity and jobs available to Plaintiff, and also directed that the

matter be assigned to a different ALJ. R. 191–95.

A different ALJ held a second hearing on February 21, 2020, at which Plaintiff, who was

again represented by counsel, testified, as did a vocational expert. R. 73–140. In a decision dated

July 14, 2020, that ALJ concluded that Plaintiff was not disabled within the meaning of the

Social Security Act from July 14, 2015, Plaintiff's alleged disability onset date, through

December 31, 2017, the date on which Plaintiff was last insured. R. 199–212 ("the 2020

decision"). On March 11, 2021, the Appeals Council vacated that decision and remanded the

case for further proceedings. R. 220–25. The Appeals Council specifically directed that the

following issues be resolved:

- The representative submitted additional medical records after the hearing that were not sufficiently considered in the hearing decision. The hearing decision states that following the hearing, the record remained open for submission of additional evidence, that the requirements of 20 CFR 404.935(b) were satisfied and that the evidence was admitted into the record (Decision, page 2). However, the hearing decision does not address four submissions from Capital Health Medical Group, received on February 24, 2020 (38 pages), February 26, 2020 (159 pages), March 3, 2020 (22 pages), and March 6, 2020 (25 pages). Per 20 CFR 404.935, the claimant and representative have a responsibility to either inform about or submit any written evidence no later than five business days before the date of the scheduled hearing. Here, on November 28, 2019 and February 10, 2020, more than five business days before the February 21, 2020 hearing, the representative provided the hearing office with letters informing about

> outstanding medical records from each of these Capital Health Medical Group offices (Exhibits 22E and 25E). These records should have been admitted into the record per 20 CFR 404.935(a) and HALLEX I-2-6-58.

Upon remand the Administrative Law Judge will:

- Consider and exhibit the records received from Capital Health Medical Group in accordance with 20 CFR 404.935(a) and HALLEX I-2-6-58.

R. 222.

On that second remand, Plaintiff appeared before the ALJ with a non-attorney. R. 141–50. Plaintiff's representative asked that the disability onset date be amended from July 14, 2015, to December 31, 2017, the date on which Plaintiff was last insured. R. 145–46. The ALJ questioned whether that change would be in the best interests of Plaintiff. R. 146–48. In a decision dated September 27, 2021, the ALJ denied the request to amend the onset date to December 31, 2017, the date on which Plaintiff was last insured, as inconsistent with the claimant's best interest. R. 13. The ALJ went on to conclude that Plaintiff was not disabled within the meaning of the Social Security Act from July 14, 2015, Plaintiff's alleged disability onset date, through December 31, 2017, the date on which Plaintiff was last insured. R. 13–30 ("the 2021 decision"). That decision became the final decision of the Commissioner of Social Security when the Appeals Council declined review on September 7, 2022. R. 1–7. Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g). ECF No. 1. On August 10, 2023, Plaintiff consented to disposition of the matter by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. ECF No. 12.[3] On August 14, 2023, the case was reassigned to the undersigned. ECF No. 13. The matter is ripe for disposition.

---

[3]The Commissioner has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

## II.    LEGAL STANDARD

### A.    Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. § 405(g). The United States Supreme Court has explained this standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019) (internal citations and quotation marks omitted); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g., Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*,

4

2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (stating that substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ's decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although an ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir.

2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981). Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016).

### B.    Sequential Evaluation Process

The Social Security Act establishes a five-step sequential evaluation process for determining whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. § 404.1520(a)(4). "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (citing *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b).  If so, then the inquiry ends because the plaintiff is not disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or combination of impairments that "significantly limits [the plaintiff's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). If the plaintiff does not have a severe impairment or combination of impairments, then the inquiry ends because the plaintiff is not disabled.  Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id*. at § 404.1509. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC") and determine whether the plaintiff can perform past relevant work. 20 C.F.R. § 404.1520(e), (f).

If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). If the ALJ determines that the plaintiff can do so, then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

## III.    THE 2021 DECISION AND APPELLATE ISSUES

Plaintiff was 43 years old on December 31, 2017, the date on which she was last insured for disability benefits. R. 16, 28. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between July 14, 2015, her alleged disability onset date, and the date on which she was last insured. R. 28.

At step two, the ALJ found that Plaintiff's diabetes with neuropathy was a severe impairment. *Id.* The ALJ also found that the following impairments were not severe: hypertension, benign thyroid nodule, glaucoma, obesity, anxiety/depression, carpal tunnel syndrome, depression, and anxiety. R. 20–23.

At step three, the ALJ found that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. R. 23–24.

At step four, the ALJ found that Plaintiff had the RFC to perform sedentary work subject to various additional limitations. R. 24–28. The ALJ also found that this RFC did not permit the performance of Plaintiff's past relevant work in the composite position of medical assistant and receptionist, or as a nursing assistant, child day care center worker, and medical assistant. R. 28.

8

At step five, the ALJ found that a significant number of jobs—*i.e.*, approximately 11,000 jobs as a final assembler, optical goods; approximately 10,000 jobs as an eyeglass frame polisher; and approximately 13,000 jobs as a dowel inspector—existed in the national economy and could be performed by Plaintiff. R. 29–30. The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act from July 14, 2015, her alleged disability onset date, through  December 31, 2017, the date on which she was last insured. R. 30.

Plaintiff disagrees with the ALJ's findings at step four and asks that the decision of the Commissioner be reversed and remanded with directions for the granting of benefits or, alternatively, for further proceedings. *Plaintiff's Memorandum of Law,* ECF No. 8; *Plaintiff's Reply Brief*, ECF No. 11. The Commissioner takes the position that his decision should be affirmed in its entirety because the ALJ's decision correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 10.

## IV.    SUMMARY OF RELEVANT MEDICAL EVIDENCE

### A.    Kimberly Levitt, M.D.

On December 16, 2019, Kimberly Levitt, M.D., completed a four-page, check-the-box, and fill-in-the-blank form entitled, "Treating Source Statement – Physical Conditions." R. 1288–91 ("Dr. Leavitt's 2019 opinion"), 1292–95 (duplicate).[4] Dr. Levitt, who is Board-certified in family medicine, stated that she had first treated Plaintiff on February 1, 2018, and had treated Plaintiff 19 times since that date. R. 1288. Dr. Levitt diagnosed peripheral neuropathy in the upper and lower extremities. *Id*. Dr. Levitt opined that Plaintiff was likely to be off task more

---

[4] For ease of reference, the Court will refer to the pages in only the first copy of this opinion.

than 25% of a typical workday due to symptoms that interfered with the attention and concentration needed to perform even simple work related tasks. *Id*. Dr. Levitt also opined that Plaintiff was able to maintain attention and concentration for less than 15 minutes before requiring a break due to symptoms such as pain or medication side effects and that Plaintiff was likely to be absent more than four days a month as a result of her impairments and/or treatment. *Id*.  Plaintiff could never lift less than 10 pounds and could rarely (meaning 1% to 5% of an 8-hour day) carry less than 10 pounds. R. 1288–89. Asked to identify the particular medical or clinical findings that supported this limitation, Dr. Levitt responded: "Dr. Witte – Neurology: EEG MRI – Brain, Bloodwork[.]" R. 1289. Dr. Levitt opined that Plaintiff could sit for 8 hours per day and could stand/walk for less than one hour, explaining, "[S]ee notes from neurologist, endocrinologist, psychologist[.]" *Id*. Plaintiff would also require the option to lie down or recline throughout the workday every 4 hours for one-half hour to one hour at a time and Plaintiff's legs should be elevated. *Id*. Plaintiff did not need a cane or assistive device to ambulate effectively, but, when asked if Plaintiff needs one sometimes, Dr. Levitt responded, "Yes as needed keeps in car[,]" noting that Plaintiff needs a single-pronged cane. R. 1289–90. According to Dr. Levitt, Plaintiff could walk about 20 feet without a cane and "has disability placard[.]" R. 1290 (citing "notes and testing from Neuro & Endo" to support this limitation). Plaintiff could continuously push/pull with her arms; could occasionally finger with her left hand; could rarely reach overhead with her arms; could never reach in all other directions with her arms; could never handle with her hands; could never finger with her right hand; and could never feel with her hands. *Id*. (citing "notes and testing from Neuro & Endo" to support this limitation). Plaintiff could occasionally use her feet to operate foot controls. *Id*. (citing "notes and testing from Rheum neuro"). Dr. Levitt also opined that Plaintiff could never climb stairs and ramps; climb

ladders and scaffolds; balance; stoop; kneel; crouch; or crawl, but could continuously rotate her head and neck. R. 1201 (citing "neuro & endo notes"). Dr. Levitt went on to opine that Plaintiff could occasionally operate a vehicle, but could never be exposed to unprotected heights, moving mechanical parts, humidity and wetness, dust/odors/fumes/pulmonary irritants, extreme cold, extreme heat, or vibrations. *Id*.

On May 19, 2021, Dr. Levitt completed the same four-page, check-the-box, and fill-in-the-blank form entitled, "Treating Source Statement – Physical Conditions." R. 2126–29 ("Dr. Levitt's 2021 opinion"). Since initially seeing Plaintiff in February 2018, Dr. Levitt had treated Plaintiff "as needed and yearly for annual phy[sical], at least over 3-6 mo for routine checks," for diabetes mellitus, hypercalcemia, peripheral neuropathy, hypertension, restrictive lung disease, major depressive disorder, obstructive sleep apnea, leg ulcer, and bilateral glaucoma. R. 2126. As with her 2019 opinion, Dr. Levitt opined that Plaintiff would be off task more than 25% of the day and would likely be absent from work more than 4 days per month, could maintain attention and concentration for less than 5 minutes before requiring a break due to symptoms such as pain or medication side effects, could never lift and carry any weight, and could sit for up to 3 hours in an 8-hour workday, but could stand/walk for less than 1 hour and would require the option to sit/stand at will. R. 2126-27. Plaintiff would also require the option to lie down or recline throughout the workday for 20 minutes every hour and her legs must always be elevated. R. 2127. According to Dr. Levitt, Plaintiff required a four-pronged cane to ambulate and could walk only 50 feet without it. R. 2127–28. According to Dr. Levitt, Plaintiff could continuously use her arms/hands to reach overhead and in all other directions, and could handle, finger, feel, and push/pull, but could never use her feet to operate foot controls. R. 2128. Plaintiff could occasionally rotate her head and neck, but could never climb stairs and ramps, climb ladders or

scaffolds, balance, stoop, kneel, crouch, or crawl. R. 2129. Finally, Dr. Levitt opined that Plaintiff could occasionally operate a vehicle and could rarely be exposed to vibrations, but could never be exposed to unprotected heights, moving mechanical parts, humidity and wetness, dust/odors/fumes/pulmonary irritants, extreme cold, or extreme heat. *Id*.

### B. Arnold Witte, M.D.

On December 20, 2019, Arnold Witte, M.D., completed the same four-page, check-the-box, and fill-in-the-blank form entitled, "Treating Source Statement – Physical Conditions." R. 2165–68 ("Dr. Witte's opinion"). Dr. Witte, a neurologist who is Board-certified in internal medicine and neurology, began treating Plaintiff for neuropathy 2.5 years prior to the date of the opinion and had seen Plaintiff on a "variable" basis since that time. R. 2165. According to Dr. Witte, Plaintiff was likely to be off task 20% of a typical workday due to symptoms that interfere with the attention and concentration needed to perform even simple work related tasks. *Id*. In response to questions asking how long Plaintiff was able to maintain attention and concentration before requiring a break due to symptoms such as pain or medication side effects; how many days per month Plaintiff was likely to be absent from work as a result of her impairments and/or treatment; how much Plaintiff could lift/carry; and how long Plaintiff could sit/stand/walk in an 8-hour workday, Dr. Witte wrote "N/A[.]" R. 2165–66. Dr. Witte denied that Plaintiff required the option to lie down or recline throughout the workday, that Plaintiff's legs should be elevated with sitting, and that Plaintiff needed a cane or other assistive device. R. 1266. Dr. Witte opined that Plaintiff could frequently (34% to 66% of an 8-hour workday) use her arms and hands to reach overhead and in all other directions and finger, use her left arm/hand to frequently handle and feel, and push/pull; she could occasionally (6% to 33% of an 8-hour workday) use her right arm/hand to handle, feel, and push/pull. R. 1265, 1267. Plaintiff could use her feet to

12

occasionally operate foot controls. R. 1267 (citing Plaintiff's "significant diabetic neuropathy"). Asked whether Plaintiff could engage in postural activities and exposure to environmental limitations, Dr. Witte responded "N/A[.]" R. 1267–68.

### C.    Ivy Pearlstein, A.P.N., F.N.P.

On February 12, 2018, Ivy Pearlstein, A.P.N., F.N.P., completed a four-page, check-the-box, and fill-in-the-blank form entitled, "Treating Source Statement – Physical Conditions." R. 1118–21 ("Nurse Pearlstein's opinion"). Nurse Pearlstein treated Plaintiff for diabetes mellitus with peripheral neuropathy, hypertension, carpal tunnel in the right wrist, and fractured left fifth toe. R. 1118. Asked how long she had treated Plaintiff, Nurse Pearlstein responded as follows: "Just started but reviewed records from recent primary providers, neurologist, endocrinologist[.]" *Id*. According to Nurse Pearlstein, Plaintiff's symptoms and limitations first appeared in 2014. *Id*. Nurse Pearlstein opined that Plaintiff was likely to be off task more than 25% of a typical workday due to symptoms that interfere with the attention and concentration needed to perform even simple work related tasks and that Plaintiff was likely to be absent more than four days a month as a result of her impairments and/or treatment. *Id*. Plaintiff could rarely (meaning 1% to 5% of an 8-hour day) lift and carry less than 10 pounds. R. 1118–19. She could sit for 8 hours and couldstand/walk for one hour total in an 8-hour workday, but would require the option to sit/stand at will. R. 1119. Nurse Pearlstein denied that Plaintiff required a cane or other assistive device to ambulate effectively. *Id*. Plaintiff could rarely use her arms/hands to reach overhead and in all other directions and to handle; and could rarely use her right arm/hand to finger, feel and push/pull. R. 1118. Plaintiff could never use her feet to operate foot controls. R. 1120. According to Nurse Pearlstein, Plaintiff could occasionally balance and rotate her head and neck; could rarely climb stairs and ramps; and could never climb ladders and scaffolds,

13

stoop, kneel, crouch, and crawl. *Id*. Finally, Nurse Pearlstein opined that Plaintiff could never

operate a vehicle and could never be exposed to unprotected heights, moving mechanical parts,

humidity and wetness, dust/odors/fumes/pulmonary irritants, extreme cold, extreme heat, or

vibrations. R. 1121.

### D.    EMG Dated December 18, 2019

An EMG administered on December 18, 2019, reflected the following findings:

Nerve conduction studies show the right median motor distal latency to be normal. Proximal conduction velocity and evoked amplitudes are normal. The right ulnar motor distal latency is normal. Proximal conduction velocity and evoked amplitudes are normal. The right median sensory response is moderately reduced in amplitude and mildly slow.

*The right ulnar sensory response is severely reduced in amplitude and mildly slow. The right radial sensory cutaneous response is borderline reduced in amplitude and normal in velocity.*

EMG of the right upper extremity from C5 through T1 fails to demonstrate spontaneous activity in any muscle sampled. With voluntary recruitment there is mild chronic appearing denervation in isolation in the right ADM.

R. 1300 ("2019 EMG") (emphasis added). The impression noted that "[t]his study is *consistent*

*with a generalized axonal polyneuropathy, such as may be seen in diabetes mellitus. There is no*

*evidence for carpal tunnel syndrome, cubital tunnel syndrome1 or cervical radiculopathy*." *Id*.

(emphasis added).


## V.    DISCUSSION

Plaintiff argues that substantial evidence does not support the 2021 decision because the

ALJ improperly discounted medical and opinion evidence that was generated after December 31,

2017, *i.e*., the date on which Plaintiff was last insured, including the 2019 EMG and the opinions

of Drs. Leavitt and Witte and of Nurse Pearlstein. *Plaintiff's Memorandum of Law*, ECF No. 8;

*Plaintiff's Reply Brief*, ECF No. 11. For the reasons that follow, this Court disagrees.

An ALJ must evaluate all record evidence in making a disability determination. *Plummer,*

186 F.3d at 433; *Cotter,* 642 F.2d at 704. The ALJ's decision must include "a clear and

satisfactory explication of the basis on which it rests" sufficient to enable a reviewing court "to

perform its statutory function of judicial review." *Cotter*, 642 F.2d at 704–05. Specifically, the

ALJ must discuss the evidence that supports the decision, the evidence that the ALJ rejected, and

explain why the ALJ accepted some evidence but rejected other evidence. *Id*. at 705–06; *Diaz v.

Comm'r of Soc. Sec*., 577 F.3d 500, 505–06 (3d Cir. 2009); *Fargnoli v. Massanari*, 247 F.3d 34,

42 (3d Cir. 2001) ("Although we do not expect the ALJ to make reference to every relevant

treatment note in a case . . . we do expect the ALJ, as the factfinder, to consider and evaluate the

medical evidence in the record consistent with his responsibilities under the regulations and case

law."). Without this explanation, "the reviewing court cannot tell if significant probative

evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705; *see also Burnett,* 220

F.3d at 121 (citing *Cotter*, 642 F.2d at 705).

In addition, "[w]hen a medical report does not address a claimant's condition during the

relevant period, the report has 'little, if any, relevance to whether [the claimant] was disabled

during that time.'" *Miller v. Comm'r of Soc. Sec*., No. 20-3642, 2021 WL 3137439, at *2 (3d Cir.

July 26, 2021) (quoting *Zirnsak v. Colvin*, 777 F.3d 607, 614 (3d Cir. 2014)); *see also Beety-

Monticelli v. Comm'r of Soc. Sec*., 343 F. App'x 743, 746 (3d Cir. 2009) (finding that the ALJ

reasonably found that a doctor's opinion rendered nearly five years after the date last insured

"lacked probative value" because it "shed no light" on the claimant's condition during the

relevant period); *Troycheck v. Kijakazi*, No. CV 22-395, 2023 WL 6129581, at *1 (W.D. Pa.

15

Sept. 18, 2023) (finding that, "Plaintiff may disagree with the ALJ's analysis, but substantial evidence supports his determination" where the ALJ assigned "little weight" to physician's opinion after noting "that the opinion was dated well after the date last insured, but also that it lacked specificity in some areas, was a mere check-box form, and was inconsistent with evidence from the relevant time period"); *Porter v. Comm'r of Soc. Sec.*, No. CV 18-03744, 2019 WL 2590994, at *4–5 (D.N.J. June 25, 2019) (finding that the ALJ did not err in assigning little weight to a physician's opinion on the basis that the opinion "'was rendered more than a year after [Plaintiff's] date last insured and [it] does not indicate that it relates back' to the disability evaluation period") (citations omitted).

Finally, "a medical condition which begins during a claimant's insured period, but does not become disabling until after its expiration, may not be the basis for qualification for disability benefits under the Act." *Capoferri v. Harris*, 501 F. Supp. 32, 36 (E.D. Pa. 1980), *aff'd* 649 F.2d 858 (3d Cir. 1981) (Table); *see also Atkins on behalf of Atkins v. Comm'r Soc. Sec.*, 810 F. App'x 122, 129 (3d Cir. 2020) ("Additionally, while the ALJ determined that Claimant's asthma was a severe impairment, the fact that she died of an asthmatic episode does not alone prove that she was disabled during the relevant time period under consideration by the ALJ. *See Szubak v. Sec'y of Health & Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984) (the later deterioration of a previously non-disabling condition is not material to the initial disability determination).").

In the present case, the ALJ determined at step two that Plaintiff had the severe impairment of diabetes with neuropathy and several non-severe impairments. R. 16–23. The ALJ expressly stated that she "considered all of the claimant's medically determinable impairments, including those that are not severe (such as the carpal tunnel syndrome), when assessing the

claimant's residual functional capacity." R. 21. The ALJ went on to determine at step four that

Plaintiff had the RFC[5] to perform a limited range of sedentary work, as follows:

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except no climbing ladders, ropes, or scaffolds. No exposure to hazards such as heavy machinery or unprotected heights. No more than occasional crouching, crawling, stooping, kneeling, balancing, or climbing ramps or stairs. No overhead reaching with the dominant (right) arm. No more than frequent handling, fingering, or feeling with the bilateral upper extremities.

R. 24. In making this determination, the ALJ detailed years of record evidence, including, *inter*

*alia*, Plaintiff's long history of poor compliance with managing her diabetes during the period at

issue; Plaintiff's acknowledgement that, when she is compliant with managing her diabetes, her

neuropathic pain is severely reduced or even absent; evidence in the record that, although

Plaintiff's neuropathic pain was controlled with Lyrica, symptoms of weakness, numbness,

tingling, and reduced sensation interfered with her functioning. R. 24–26. The ALJ went on to

explain, *inter alia*, the findings regarding Plaintiff's limitations as follows:

> Considering all these factors, I feel the residual functional capacity is sufficient in addressing the claimant's impairments, not only the severe, but also the non-severe. The restriction to sedentary exertion addresses the evidence that shows the

---

[5] A claimant's RFC is the most that the claimant can do despite her limitations. 20 C.F.R. § 404.1545(a)(1). At the administrative hearing stage, it is the ALJ who is charged with determining the claimant's RFC. 20 C.F.R. § 404.1546(c); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations.") (citations omitted). When determining a claimant's RFC, the ALJ has a duty to consider all the evidence. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). However, the ALJ need include only "credibly established" limitations. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *see also Zirnsak*, 777 F.3d at 615 (stating that the ALJ has discretion to choose whether to include "a limitation [that] is supported by medical evidence, but is opposed by other evidence in the record" but "[t]his discretion is not unfettered—the ALJ cannot reject evidence of a limitation for an unsupported reason" and stating that "the ALJ also has the discretion to include a limitation that is not supported by any medical evidence if the ALJ finds the impairment otherwise credible").

claimant's main symptoms are in her lower extremities and that she benefits from staying off her feet to reduce her neuropathic pain. The claimant appears capable of handling two hours standing walking as she did admit to walking two miles twice a week within eight months of having her son during the period at issue. The sedentary exertion limit (lift/carry less than 10 pounds frequently, up to 10 pounds occasionally) accommodates issues of fatigue from her diabetes and side effect of medication as well as reducing aggravating the neuropathic pain in her upper and lower extremities. Due to the decreased sensation in the extremities, which can lead to instability, the claimant is precluded from climbing ladders, ropes, or scaffolds or being exposed to hazardous environments; the claimant's impairments make such activities and exposure dangerous due to decreased agility or ability to support herself from decreased sensation. The limitation to occasional postural activity helps to limit the neuropathic pain. The prohibition on overhead activity with the right upper extremity addresses the neuropathic symptoms in the upper extremity along with the onset of the musculoskeletal impairment just before the date last insured. The limitation to frequent handling, fingering, and feeling with both upper extremities accounts for the periods when the claimant is documented with neuropathic signs in her hands and accounts for her symptoms. A greater limitation is not supported given that the claimant has several examinations by neurology that are unremarkable for findings in the upper extremities in terms of diminished sensation or lack of function (Exhibit 14F).

R. 26–27. At step five, the ALJ went on to find that, considering this RFC as well as Plaintiff's age, education, and work experience, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed. R. 29–30. The ALJ therefore concluded that Plaintiff was not under a disability at any time from July 14, 2015, her alleged disability onset date, through December 31, 2017, the date on which she was last insured. R. 30. In the view of this Court, this record contains substantial evidence to support the ALJ's RFC determination as well as her determination at step five. *See Zirnsak*, 777 F.3d at 614–15; *Rutherford*, 399 F.3d at 554; *Plummer*, 186 F.3d at 429.

In challenging the ALJ's decision, Plaintiff first argues that "the ALJ made explicitly clear at Plaintiff's July 2021 hearing that she found evidence dated after Plaintiff's [sic] December 31, 2017 'not relevant,' and therefore gave such evidence little, if any, consideration." *Plaintiff's Brief*, ECF No. 8, pp. 7–12 (citing, *inter alia*, R. 143; Exhibits 36F through 39F, R.

1791–2034). In fact, however, and as the Commissioner correctly notes, *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 10, p. 7, the ALJ expressly discussed these exhibits in the 2021 decision, and noted that much of this evidence was duplicative of what had already been entered into the record:

> I have reviewed all of the records submitted for consideration, including the specific records that were the basis of the remand, Exhibits 36F through 39F. It is noted that while these records (and those submitted subsequent to the remand; Exhibits 40F through 53F) contain pieces relevant to the period at issue, the vast majority of them are for the period after the date last insured of December 31, 2017 and have little relevance to the matter before me. Also, most of the records from the period at issue in these later records are copies of records previously submitted in earlier exhibits.

R. 26. Accordingly, Plaintiff has not shown that the ALJ improperly gave "little, if any, consideration" to this evidence.

Plaintiff also contends that the ALJ erred in considering later-generated evidence, including the opinions of Drs. Leavitt and Witte and of Nurse Pearlstein, as well as the 2019 EMG. For the reasons that follow, Plaintiff's arguments are not well taken.

For claims filed before March 27, 2017,[6] "'[a] cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Nazario v. Comm'r Soc. Sec.*, 794 F. App'x 204, 209 (3d Cir. 2019) (quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)); *see also Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008) (stating that an ALJ should give treating physicians' opinions "great weight") (citations omitted); *Fargnoli*, 247 F.3d at 43 (3d Cir. 2001) (stating that a treating physician's opinions "are entitled to substantial and at times even controlling weight") (citations omitted). However, "[a] treating source's opinion is

---

[6] As previously noted, Plaintiff's claim was originally filed on July 31, 2015.

not entitled to controlling weight if it is 'inconsistent with the other substantial evidence in [the] case record.'" *Hubert v. Comm'r Soc. Sec.*, 746 F. App'x 151, 153 (3d Cir. 2018) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also Brunson v. Comm'r of Soc. Sec.*, 704 F. App'x 56, 59–60 (3d Cir. 2017) ("[A]n ALJ may reject the opinion of a treating physician when it is unsupported and inconsistent with the other evidence in the record."). "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (internal quotation marks and citations omitted). The ALJ must consider the following factors when deciding what weight to accord the opinion of a treating physician: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the record as a whole; (5) the treating source's specialization; and (6) any other relevant factors. 20 C.F.R. § 404.1527(c)(1)–(6). Accordingly, "the ALJ still may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" *Sutherland v. Comm'r Soc. Sec.*, 785 F. App'x 921, 928 (3d Cir. 2019) (quoting *Morales*, 225 F.3d at 317); *see also Nazario*, 794 F. App'x at 209–10 ("We have also held that although the government 'may properly accept some parts of the medical evidence and reject other parts,' the government must 'provide some explanation for a rejection of probative evidence which would suggest a contrary disposition.'") (quoting *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994)); *Morales*, 225 F.3d at 317 ("Where . . . the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit[.]"); *Cotter*, 642 F.2d at 706–07 ("Since it is apparent that the ALJ cannot reject evidence for no reason or for the

wrong reason, . . . an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper.") (internal citation omitted).

### A. Kimberly Levitt, M.D.

In crafting the RFC, the ALJ considered the opinions of Dr. Levitt, but assigned "little weight" to those opinions, reasoning as follows:

> Similarly little weight is given to the opinions of Dr. Kimberly Levitt from December 16, 2019 (Exhibits 27F, pages 20-23 and 28F) and May 19, 2021 (Exhibit 45F). Like NP Peralstein [sic], *Dr. Levitt did not start treating the claimant until after the date last insured.* Unlike NP Peralstein [sic], *Dr. Levitt does not state that she has reviewed the claimant's treatment notes from the period at issue. There is no statement that the opinions provided apply to the period at issue.* In fact, the 2021 opinion notes that *increased restrictions in exertion capacity* (sitting limited to three hours in an 8-hour workday, stand/walk less than 1 hour in an 8-hour workday, and no lifting/carrying) *are due to the development of interstitial lung disease, an impairment that did not exist during the period at issue. The lack of connection to the period at issue, the lack of any statement of the opinions applying to the period at issue, and the lack of objective evidence from the initial encounters that could tangentially connect the opinions to the period at issue make them of little value in this case.*

R. 28 (emphasis added). The Court finds no error with the ALJ's consideration in this regard. *See Miller*, 2021 WL 3137439, at *2; *Zirnsak*, 777 F.3d at 614; *Beety-Monticelli*, 343 F. App'x at 746; *Ortega v. Comm'r of Soc. Sec.*, 232 F. App'x 194, 197 (3d Cir. 2007) ("Wholly aside from the fact that when applying for benefits, Ortega did not even allege disability based on obesity, the record shows that his obesity did not develop until well after his insured status expired. . . . Ortega likewise submitted no evidence that he was diagnosed with diabetes until after his last insured date."); *cf. Phillips v. Barnhart*, 91 F. App'x 775, 780 (3d Cir. 2004) (concluding that the ALJ appropriately assigned limited weight to a treating physician's opinion where his "treatment notes, and in particular the treatment notes during the [relevant period], d[id] not support a finding that [plaintiff] was disabled at any time").

Plaintiff, however, contends that Dr. Levitt began treating Plaintiff "*just four weeks* after Plaintiff's DLI [date last insured]" and improperly discounted her opinions "because of a hard DLI cutoff." *Plaintiff's Memorandum of Law*, ECF No. 8, p. 13 (emphasis in the original). Again, Plaintiff's argument mis-characterizes the record. As set forth above, the ALJ explained why Dr. Levitt's opinions did not relate to the period at issue: Dr. Levitt did not say that she had reviewed Plaintiff's treatment notes from the relevant period, nor did she relate her opined limitations to the period at issue. Therefore, the ALJ did not err in concluding that these opinions had limited probative value. R. 28; *see also Miller*, 2021 WL 3137439, at *2; *Zirnsak*, 777 F.3d at 614; *Beety-Monticelli*, 343 F. App'x at 746. Moreover, the ALJ based the discounting of Dr. Levitt's opinions not only on "the lack of connection to the period at issue," but also on the fact that Dr. Levitt based her opined limitations on an impairment—interstitial lung disease—that did not exist during the relevant period. R. 28. *See Ortega*, 232 F. App'x at 197. Plaintiff's argument that the ALJ discounted Dr. Levitt's opinions simply "because of a hard DLI cutoff" misses the mark.

Plaintiff also argues generally that, although the applicable regulation required that the ALJ give controlling weight to treating opinions, the ALJ instead rejected all treating opinions—including those of Dr. Levitt—and failed to provide good reasons for discounting those opinions. *Plaintiff's Memorandum of Law*, ECF No. 8, pp. 15–16. To the contrary, the recitation above establishes that the ALJ gave good reasons for discounting Dr. Levitt's opinions. R. 28; *see also Miller*, 2021 WL 3137439, at *2; *Zirnsak*, 777 F.3d at 614; *Beety-Monticelli*, 343 F. App'x at 746; *Ortega*, 232 F. App'x at 197.

Plaintiff also contends that Dr. Levitt's opinions are consistent with the 2019 EMG ("showing a 'severely reduced' sensory response consistent with polyneuropathy, as 'may be

seen in diabetes mellitus'") and with an EMG administered in 2015. *Plaintiff's Memorandum of Law*, ECF No. 8, pp. 13–14 (citing, *inter alia*, R. 1300). In particular, Plaintiff argues that, because the ALJ "relied on [the 2019] study to discount Plaintiff's carpal tunnel complaints for the period prior to her DLI [date last insured]," the 2019 EMG "should be deemed relevant and supportive of Plaintiff's disability due to diabetic peripheral neuropathy prior to her December 31, 2017 DLI." *Id*. at 14 (citing, *inter alia*, R. 21). The Court is not persuaded that this issue requires remand. At step two of the sequential evaluation, the ALJ considered whether Plaintiff suffered from the severe impairment of carpal tunnel syndrome, as follows:

> The claimant's records and her testimony from the February 20, 2021 hearing note a development of mild carpal tunnel syndrome at the end of her pregnancy. Treatment records reference carpal tunnel syndrome, but the recommended treatment is conservative in nature (Exhibits 2F, 5F). EMG from May 22, 2015 showed mild mononeuropathy at the right wrist with no axon loss (Exhibit 2F). A brace was recommended. There are minimal treatment records related to this until an EMG on December 18, 2019, nearly two years after the date last insured (Exhibit 29F). This testing showed no evidence of carpal tunnel syndrome. Given the minimal evidence and conservative treatment, I find insufficient evidence showing the condition rises to the level of a severe impairment. All the same, I have limited the claimant's Residual Functional Capacity to frequent handling, fingering and feeling, bilaterally.

> I considered all of the claimant's medically determinable impairments, including those that are not severe (such as the carpal tunnel syndrome), when assessing the claimant's residual functional capacity.

R. 21. Although Plaintiff insists that the ALJ used the 2019 EMG to "discount" her complaints relating to carpal tunnel syndrome, the recitation above reflects that the ALJ simply referred to these studies in finding that this impairment was non-severe, noting that the record during the relevant period contained "minimal treatment records" regarding this condition and that the 2019 EMG reflected no evidence of carpal tunnel syndrome at that point. *See id*.; *see also* R. 1300. Moreover, the ALJ did not completely dismiss Plaintiff's carpal tunnel syndrome, but instead expressly accommodated the condition in the RFC. R. 21, 27 ("The need to address the

claimant's symptoms of neuropathic issues in her upper extremities (along with the non-severe carpal tunnel and right shoulder issues) supports the inclusion of the manipulative limitations.").

In any event, to the extent that Plaintiff insists that evidence of diabetic peripheral neuropathy reflected in the 2019 EMG supports Dr. Levitt's opinions that Plaintiff, *inter alia*, would be off task more than 25% of a typical workday and that Plaintiff could rarely or never use her hands to reach, handle, or feel, *Plaintiff's Memorandum of Law*, ECF No. 8, p. 13 (citing, *inter alia*, R. 1289–90, 1292–94, 2126), that assertion is not well taken. As a preliminary matter, the existence of polyneuropathy consistent with diabetes mellitus as reflected in the 2019 EMG does not necessarily translate into functional limitations. *Cf. Foley v. Comm'r of Soc. Sec*., 349 F. App'x 805, 808 (3d Cir. 2009) ("A diagnosis alone . . . does not demonstrate disability.") (citing *Petition of Sullivan*, 904 F.2d 826, 845 (3d Cir. 1990)); *Phillips v. Barnhart*, 91 F. App'x 775, 780 (3d Cir. 2004) ("[The claimant's] argument incorrectly focuses on the diagnosis of an impairment rather than the functional limitations that result from that impairment. A diagnosis of impairment, by itself, does not establish entitlement to benefits under the Act"). Moreover, the evidence detailed above in connection with the ALJ's RFC determination makes clear that, during the relevant period, the symptoms flowing from Plaintiff's diabetes with neuropathy were severely reduced/managed or even absent when she was compliant with managing her diabetes, but that Plaintiff had a long history of poor compliance managing her diabetes during the relevant period. R. 24–26. Based on this record, the Court cannot say that the ALJ improperly or inconsistently relied on the 2019 EMG such that this study "should be deemed relevant and supportive of Plaintiff's disability due to diabetic peripheral neuropathy prior to her December 31, 2017 DLI" or otherwise undermine the ALJ's consideration of Dr. Levitt's opinions.

In continuing to challenge the ALJ's consideration of Dr. Levitt's opinions, Plaintiff observes in a footnote that Dr. Levitt, like a physician (Dr. Holgado) in a case that this Court previously remanded, "did not begin treating Plaintiff until years after the relevant period." *Plaintiff's Reply Brief*, ECF No. 11, p. 8 n.2 (citing, *inter alia*, *Lorraine D. v. Kijakazi*, No. 1:21-cv-4353, at *7 (D.N.J. Nov. 30, 2022)). *Lorraine D.* is inapposite. In that case, this Court expressly found that, although the physician did not begin to treat the claimant until years after the date on which the claimant was last insured, the physician expressly related the claimant's pain to the relevant period. *Id.* In contrast, and as the ALJ in this case noted, Dr. Levitt "did not state that she has reviewed claimant's treatment notes from the period at issue"; that "[t]here is no statement that the opinions provided apply to the period at issue"; that there was "a lack of objective evidence from initial encounters that could tangentially connect the opinions to the period at issue[,]" and, therefore, that Dr. Levitt's opinions lack "connection to the period at issue[.]" R. 28.

### B.    Arnold Witte, M.D.

The ALJ also specifically considered the Dr. Witte's opinion when crafting the RFC, but assigned "[v]ery limited weight" to that opinion, reasoning as follows:

> Very limited weight is given to the opinion of Dr. Witte from December 20, 2019 (Exhibit 26F). Dr. Witte was the claimant's treating neurologist starting in 2017. In the opinion, Dr. Witte finds the claimant limited to frequent use of the left arm and frequent to occasional use of the right arm. He also finds the claimant would be off-task 20% of the workday. Dr. Witte does not state in the opinion, dated almost two years after the date last insured, if his opinion is applicable to the period at issue or is the claimant's functional assessment at the time. There is no explanation for the off-task limitation (what symptoms require it, what is involved with being "off-task," etc.). Dr. Witte's treatment notes support[] the need for limitations in the claimant's manipulative ability, primarily based on the right shoulder impairment. The treatment notes in late 2017/early 2018 are unremarkable for acute neurological findings. As such, I have included some limitation in handling, fingering and feeling, bilaterally, to accommodate the non-severe impairment and the history of upper extremity neurological findings in earlier records during the period at issue.

> The date of Dr. Witte's opinion, his very limited care of the claimant during the period at issue (less than one month total) and the lack of explanation of relevance to the period at issue severely limits this opinion's reliability.

R. 27. Notably, although the value of Dr. Witte's opinion was reduced by the doctor's failure to explain his off-task limitation and failure to state if his opinion applied to the relevant period, the ALJ did not reject that opinion outright; rather, the ALJ expressly accommodated upper extremity limitations in Plaintiff's RFC to the extent that the record during the relevant period supported such limitations. *Id.*

Substantial evidence supports the ALJ's consideration of Dr. Witte's opinion. *See Miller*, 2021 WL 3137439, at *2; *Zirnsak*, 777 F.3d at 614; *Beety-Monticelli*, 343 F. App'x at 746; *Rutherford*, 399 F.3d at 554 (stating that an ALJ need include only "credibly established limitations[,]" *i.e.*, limitations that are "medically supported and otherwise uncontroverted in the record"); *cf. Galette v. Comm'r Soc. Sec.*, 708 F. App'x 88, 91 (3d Cir. 2017) ("As we have explained, forms that 'require[ ] the physician only to check boxes and briefly to fill in blanks . . . are weak evidence at best.'") (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)). To the extent that Plaintiff challenges the ALJ's consideration of Dr. Witte's opinion and argues that the applicable regulations require that the ALJ to give controlling weight to treating opinions such as Dr. Witte's and that the ALJ failed to give good reasons for discounting this opinion, *Plaintiff's Memorandum of Law*, ECF No. 8, pp. 15–16, those arguments are unavailing for the reasons previously discussed.

### C.     Ivy Pearlstein, A.P.N., F.N.P.

At step four of the sequential evaluation, the ALJ also considered Nurse Pearlstein's opinion when crafting the RFC; however, she assigned "[l]ittle to no weight" to that opinion, explaining as follows:

Little to no weight is given to the opinion of NP Ivy Peralstein [sic] from February 12, 2018 (Exhibit 17F). NP Pearlstein found the claimant capable of less than sedentary exertion with limitations of being off task more than 25% of the day and missing more than four days per month. She also found the claimant with a need for a sit/stand option and need for occasional to rare manipulative ability with the bilateral upper extremities. NP Peralstein's [sic] assessment is dated after the date last insured. February 12, 2018 was also her first encounter with the claimant. She states in the opinion that she was basing the assessment on her review of PCP, neurology, and endocrinology records she had obtained upon taking on the care of the claimant. However, it is not clear which records she reviewed. It is not definitive she had access to the same records that Drs. Shahinian and Shubeck [the state agency consultatns] reviewed. Also, the assessment does not appear based on her own examination of the claimant as the treatment notes from that initial visit are unremarkable save for finding the claimant with some difficulty ambulating due to a broken left toe (Exhibits 23F, 24F). Due to the combination of it coming after the date last insured, the lack of firsthand knowledge for the period at issue, an inability to know what evidence was reviewed, and the lack of objective findings from the date of the opinion, I find this opinion has little persuasive value and does not provide assistance in evaluating the residual functional capacity.

R. 27–28. The Court cannot say that the ALJ erred in this regard. *See Miller*, 2021 WL 3137439, at *2; *Hubert v. Comm'r Soc. Sec.*, 746 F. App'x 151, 153 (3d Cir. 2018) ("A treating source's opinion is not entitled to controlling weight if it is 'inconsistent with the other substantial evidence in [the] case record.'") (quoting 20 C.F.R. § 404.1527(c)(2)).

Plaintiff contends that the ALJ erred by imposing a "hard" cut-off date of December 31, 2017, *i.e.*, the date on which Plaintiff was last insured, in discounting Nurse Pearlstein's 2018 opinion. *Plaintiff's Memorandum of Law*, ECF No. 8, p. 13; *Plaintiff's Reply Brief*, ECF No. 11, pp. 3–7. Plaintiff specifically emphasizes that Nurse Pearlstein's opinion was dated merely six weeks after the relevant time period. *Plaintiff's Memorandum of Law*, ECF No. 8, p. 13; *Plaintiff's Reply Brief*, ECF No. 11, pp. 3–5 (citing, *inter alia*, *Lorraine D.*, 2022 WL 17340661, at *6–7). Plaintiff further argues that this opinion relates to the relevant period because Nurse Pearlstein stated that she had reviewed recent records from treating providers and that Plaintiff's symptoms and limitations first appeared in 2014, *i.e.*, three years before the lapse of Plaintiff's

insured status. *Plaintiff's Reply Brief*, ECF No. 11, pp. 4–6. Plaintiff also contends that the ALJ erred in discounting Nurse Pearlstein's opinion because of the sufficiency of her review which, Plaintiff argues, exceeded the review of the state agency medical consultants. *Id*. at 5–7. Plaintiff has not persuaded this Court that this issue requires remand.

As a preliminary matter, the ALJ did not discount Nurse Pearlstein's opinion because of a "hard" cut-off date. Rather, the ALJ identified a number of reasons for discounting this opinion: "the combination of it coming after the date last insured, the lack of firsthand knowledge for the period at issue, an inability to know what evidence was reviewed, and the lack of objective findings from the date of the opinion[.]" R. 28. Moreover, and although Nurse Pearlstein stated that she had reviewed recent treating records and opined that Plaintiff's symptoms and limitations had first appeared in 2014, the Court is not persuaded that her statement and opinions are dispositive.

Plaintiff first insists that Nurse Pearlstein sufficiently explained what records she had reviewed. However, it was not unreasonable for the ALJ to question the scope of this provider's review of "recent"—otherwise undefined—records at the time of her first examination of Plaintiff on February 12, 2018. R. 28, 1118. For example, it is not entirely clear how a review in February 2018 of "recent" treating records supports her finding that Plaintiff's symptoms and limitations date back to 2014. *Cf. Troycheck v. Kijakazi*, No. CV 22-395, 2023 WL 6129581, at *1 (W.D. Pa. Sept. 18, 2023) ("Plaintiff seems to believe that Dr. Talaman-Perez's opinion covers the relevant time period simply because she said that it does."); *Manzo v. Sullivan*, 784 F. Supp. 1152, 1156 (D.N.J. 1991) ("Evidence of an impairment which reached disabling severity after the date last insured, or which was exacerbated after this date, cannot be the basis for the

determination of entitlement to a period of disability and disability insurance benefits.") (citing, *inter alia*, *De Nafo v. Finch*, 436 F.2d 737, 739 (3d Cir. 1971)).

In any event, as previously noted, the ALJ also discounted Nurse Pearlstein's opinion because it did not appear to be based on that provider's own examination of Plaintiff, which was "unremarkable save for finding the claimant with some difficulty ambulating due to a broken left toe (Exhibits 23F [R. 1238–46], 24F [R. 1247–59])." R. 28; *see also* R. 1241 (reflecting under the heading "Chief Complaint" that Plaintiff sought completion of a disability form and that she complained of "sleep problems due to shoulder pain"), 1243 (reflecting normal tone and motor strength with, *inter alia*, no tenderness and "normal movement of all extremities"; no cyanosis, edema, varicosities, or palpable cord in the extremities; no dyspnea and normal breath sounds; normal mood and affect with normal recent and remote memory; but "limited ambulation (broken left toe)"), 1251 (duplicate of R. 1241), 1253 (duplicate of R. 1243). In short, the ALJ also properly discounted Nurse Pearlstein's extreme opinion because it was not supported by or consistent with objective findings from her own contemporaneous examination notes. *See Hubert*, 746 F. App'x at 153; *Brunson*, 704 F. App'x at 59–60.

To the extent that Plaintiff generally argues that the ALJ did "not provide[] good reasons or persuasive evidence" when discounting the treating opinions, including Nurse Pearlstein's opinion, *Plaintiff's Memorandum of Law*, ECF No. 11, p. 16, that argument is not well taken for the reasons already discussed.

### D.    2019 EMG

In her reply brief, Plaintiff again complains that the ALJ improperly rejected evidence generated after December 31, 2017. *Plaintiff's Reply Brief*, ECF No. 11, pp. 7–9 (citing, *inter alia*, *Lorraine D.*, 2022 WL 17340661, at *6–7). Plaintiff specifically contends that "[t]he ALJ's

selective use of the 2019 EMG study to marginalize Plaintiff's carpal tunnel complaints, but ignored the fact that the severe diabetic neuropathy findings of that same study confirm Plaintiff's worsening diabetic neuropathy complaints, was an inconsistent application of the 'relation back' concept found harmful in *Lorraine D*." *Id*. at 9. Plaintiff's arguments are not well taken. As previously explained, the ALJ did not use the 2019 EMG to improperly discount Plaintiff's complaints regarding carpal tunnel syndrome. R. 21, 1300. As noted above, the Court concludes that *Lorraine D.* is inapposite to the facts presented in this case.

In any event, Plaintiff's assertion that the 2019 EMG reflected "severe diabetic neuropathy findings" that "confirm Plaintiff's *worsening* diabetic neuropathy complaints[,]" *Plaintiff's Reply Brief*, ECF No. 11, p. 9 (emphasis added), does not undermine the ALJ's decision, nor does it otherwise militate a finding of disability. As explained above, "a medical condition which begins during a claimant's insured period, but does not become disabling until after its expiration, may not be the basis for qualification for disability benefits under the Act." *Capoferri*, 501 F. Supp. at 36; *see also Atkins*, 810 F. App'x at 129; *Manzo*, 784 F. Supp. at 1156. Notably, the ALJ expressly considered Plaintiff's neuropathy and explained how she accommodated the symptoms and limitations flowing from that impairment during the relevant period. R. 26–27.

At bottom, for all these reasons, the Court concludes that the ALJ's consideration of the evidence, including the opinions of Drs. Leavitt and Witte and of Nurse Pearlstein—as well as the 2019 EMG—enjoys substantial support in the record. The Court therefore **AFFIRMS** the Commissioner's decision.

Date:  October 24, 2024                              *s/Norah McCann King*
                                                              NORAH McCANN KING
                                                              UNITED STATES MAGISTRATE JUDGE